FILED

2013 Mar-22  AM 08:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TIFFANY AUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CERTEGY PAYMENT | ) | CV-11-RRA-401-S |
| RECOVERY SERVICES, INC., | ) | |
| and CERTEGY CHECK SERVICES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION

This is a civil action filed by the plaintiff, Tiffany Austin, against the defendants,

Certegy Payment Recovery Services, Inc. ("CPRS"), and Certegy Check Services, Inc.

("CCS"). The re-stated second amended complaint refers to both defendants collectively and

confusingly as "Certegy." (Doc. 49.) It alleges violations of the Fair Credit Reporting Act

("FRCA"), 15 U.S.C. § 1681, et seq. (Count One); defamation (Count Two), invasion of

privacy/false light (Count Three); Negligence (Count Four); and Malicious Prosecution and

False Imprisonment (Count Five). The case comes before the court on the plaintiff's motion

for summary judgment on her claims against CCS as to liability only. (Doc. 100.)

STANDARD

In considering a motion for summary judgment, the court must determine whether the

moving party is entitled to judgment as a matter of law. Summary judgment may be granted

only if there are no genuine issues of material fact and the movant is entitled to  judgment as

a matter of law.  Fed. R. Civ. P.56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  See Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, the non-moving party may not merely rest upon his pleadings, but must come forward with evidence supporting each essential element of his claim.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Barfield v. Brierton, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Bennett v. Parker, 898 F.2d 1530 (11th Cir. 1990).

FACTS

The State of the Facts

The facts, as set out by the movant-plaintiff, are confusingly set out. Sometimes they cite evidence that does not exist at all.  For that reason, many of the facts offered by the plaintiff have

2

been omitted.[1] Furthermore, the movant does not respond to the facts alleged by the non-movant.[2] The court's scheduling order provides that *"[a]ll additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant."* (Doc. 10, p. 9) (emphasis in original). Since the non-movant's facts have not been denied, they are deemed to be admitted and, for the most part, are set out exactly as they were offered.

To the extent that the plaintiff has offered a fact which is relevant and properly supported, it has been included, unless it was also included in the non-movant's facts or it was contradicted by a fact of the non-movant.[3]

The Uncle Bob's Storage Unit and the Allegedly Stolen Checks

In June of 2008, the plaintiff and her former landlord had a dispute, and the plaintiff decided to rent a storage unit at Uncle Bob's Self Storage. She put all of her belongings into the Uncle Bob's storage unit, except for a television, den furniture, dining room furniture, and her clothes. Also, the plaintiff put in the unit a file cabinet which contained bills, receipts, and old checks.

On November 12, 2008, the plaintiff went to her designated storage unit to remove her belongings, but discovered that all of her belongings had been stolen with the exception of a box of her personal items. Austin and Uncle Bob's reported the theft to the Bessemer Police Department

[1]See Appendix 1 at the end of this document for a thorough discussion of the facts which were omitted and why.

[2]Indeed, the movant files no reply brief at all.

[3]The court must set out the facts in the light most favorable to the non-movant.

the same day. Officer Vick Cullen of the Bessemer Police Department arrived at Uncle Bob's and prepared an Alabama Uniform Incident/Offense Report, which listed several stolen items, but did not list checks.  The plaintiff states that she listed only major items, as she did not have enough room on the report and the officer told her to list what she could.

### The Use of Plaintiff's Checks at Bruno's Supermarkets

The plaintiff's checks were used to purchase items at Bruno's Supermarkets, LLC on two separate occasions. The first check was for $40.77 and was written on November 19, 2008. Written on the $40.77 check was a driver's license number of "7478045."  This number is different than the plaintiff's driver's license number. Nearly nine months later, on July 29, 2009, another check was written at Bruno's in the amount of $241.72. The plaintiff claims that both of these checks were forged and were from the batch taken from her storage unit.

### The Involvement of CCS and CPRS

On November 19, 2008, when an unknown individual attempted to pass the $40.77 check, Bruno's, through its computer terminal at the check-out, transmitted the driver's license number written on the check (#7478045) to a computer system at CCS, to request authorization for the check. As noted above, this driver's license number was not the plaintiff's.

As a part of CCS's authorization process, the CCS computer system performed a search to determine if the driver's license number that Bruno's transmitted to CCS was associated with any checks that had been presented for authorization and were subsequently returned unpaid.  CCS's computer system then sent a message back to Bruno's, informing them that the $40.77 check was

4

authorized by CCS, since the license number was not associated with any prior returned check.

On December 1, 2008, when the check was not paid, CPRS was retained by Bruno's to attempt to collect on the $40.77 check.  The collection services provided by CPRS to Bruno's were limited and subject to a "Collection Services Agreement" entered into between CPRS and Bruno's. Pursuant to the Collection Services Agreement between Bruno's and CPRS, Bruno's retains ownership over any check it sends to CPRS for collection.

Between December 1, 2008 and January 30, 2009, CPRS sent two letters to the plaintiff regarding the $40.77 check, and also made a limited number of phone calls to the plaintiff requesting payment.  In the two letters, CPRS stated that Austin's check writing privileges "may be denied" until the [$40.77] check is paid."  (Doc. 111-7, pp. 56, 57.)

Pursuant to the request of Bruno's, on January 30, 2009, CPRS sent an electronic message to Bruno's third-party letter vendor High Cotton, located in Birmingham, Alabama, stating that the parameters for district attorney eligibility had been met.  Pursuant to the request of Bruno's, CPRS sent notification of the $40.77 check to Bruno's accounting service FMS Solutions, located in Pasadena, California.  CPRS sent an electronic message to FMS Solutions indicating that a $40.77 check had been passed from the plaintiff's account and that the check had been returned due to insufficient funds.  Also on January 30, 2009, pursuant to the request of Bruno's, CPRS ceased all collection efforts regarding the $40.77 check. Pursuant to the Collection Services Agreement with Bruno's, CPRS was engaged to make collection efforts for 60 days. Once CPRS stopped its collection efforts regarding the $40.77 check, CPRS did not look into the validity of the check, did not investigate the check, and had no further involvement with the check.

On March 13, 2009, a representative of Bruno's called CPRS to inform it that the $40.77

check was in prosecution. The March 13, 2009 call from Bruno's was CPRS's first notice that the check was in prosecution. CPRS conducted no investigation as to the validity or fraudulence of the checks.

On July 28, 2008, the plaintiff wrote a check to Midfield Animal Clinic on her Compass Bank Account in the amount of $84.80. She admits that she wrote this check and that it was returned for insufficient funds in July of 2008.  At the time the check was written, the plaintiff did not have enough money in her bank account to cover the Midfield Animal Check. On August 13, 2008, CPRS was retained by CCS to collect on the Midfield Animal Check.

CPRS sent seven letters to the plaintiff requesting payment. The plaintiff stated that when she received CPRS's letters regarding the Midfield Animal Check, she "disregarded" them. She never made a payment on the Midfield Animal Check and did not call CPRS regarding the letters she received.

According to call notes and check authorization requests retained by CCS, on September 15, 2009 a Wal-Mart in Fairfield, Alabama electronically requested authorization from CCS regarding a check that was presented by Austin. Wal-Mart submitted the check number, routing number, and account number on the check, as well as the plaintiff's driver's license number. Wal-Mart requested authorization from CCS at approximately 10:48 a.m.  Due to several returned checks associated with the plaintiff's driver's license number, CCS did not provide authorization for this check.

Pursuant to Wal-Mart's check authorization contract with CCS, when an item is not authorized by CCS, Wal-Mart provides consumers, such as the plaintiff, with CCS's contact information to order inquire as to the reasons why the check transaction was not authorized. CCS's contact information includes a toll-free number.

6

On September 15, 2009, the plaintiff called CCS at its toll-free number to inquire why the check she presented to Wal-Mart was not authorized. The plaintiff was informed that she had two returned checks related involving her former driver's license number, AL 7004085.  She was also informed that she had one returned check related to her current identification number, and that that check had been presented at Midfield Animal Clinic. The returned checks mentioned by CCS did not include the $40.77 Bruno's Check, as that check had been presented with a driver's license number that did not match the plaintiff's.

CPRS has no record of receiving any phone call from the plaintiff regarding the $40.77 check. The plaintiff states that she called CPRS and told them that "the checks had been stolen." (Doc. 59-1, p. 15(60).)  She alleges that the CPRS representative told her that there was nothing that they could do about it.  (Doc. 59-1, p. 15(60).)  The plaintiff states that "she could not remember the exact date of her call."  (Doc. 59-1, p. 41(161).)

On September 15, 2009, CCS sent the plaintiff a follow-up letter to her telephone call that acknowledged her "inquiry" and stated, in pertinent part, as follows:

> With regard to your specific inquiry, please allow us to offer the following explanation. After further research, our records indicate that multiple outside agencies have reported information to CCS concerning returned checks. We ask that you please contact them at the numbers listed below for complete resolution.
>
> | Agency | Phone No. |
> |---|---|
> | CPRS | 1-800-873-5869 |
> | Trident Asset Management | 1-866-695-8893 |
>
> As a check guarantee and warranty service, CCS insured the face value of the check number 0128 for $84.80 upon presentation to our subscriber Midland Animal clinic on 07/26/08. After several failed attempts to collect, the claim was forwarded to an outside agency for collection. Although the information is maintained in our files, only Valentine & Kebartas can request the information be amended or deleted. We ask that you please contact them directly at 1-866-598- 2788 for complete resolution.

(Doc. 111-3, p. 4.)

7

The plaintiff acknowledges receiving this letter, but states that she "probably just put it with the rest of everything else" in her filing cabinet. According to CCS's records, the plaintiff's September 15, 2009 telephone call is the only phone call, letter, or communication that CCS has ever received from the plaintiff.  The plaintiff never contacted CCS regarding the $40.77 Bruno's Check.

### Collection Efforts on Allegedly Stolen Checks.

After receiving several collection letters, the plaintiff called the Birmingham police and made a supplemental police report.  The police report listed several allegedly stolen checks connected with two bank accounts held by the plaintiff, one at Wachovia Bank and the other at Compass Bank. Before the alleged theft, both her Wachovia Bank account and her Compass Bank account had been closed, either voluntarily by the plaintiff or involuntarily by the respective bank. The collection letters referenced checks that were written on the Wachovia Bank account and on the Compass Bank account. These checks involved various vendors, and numerous companies wrote the plaintiff collection letters.

The plaintiff testified that as to each of the above-referenced checks she never called any of the collection companies, with the exception of CPRS, to alert them that the checks passed in her name were forged.  In fact, no communication was made with these entities regarding the alleged forged checks until over one year later, when she retained her counsel in this matter.

### The Plaintiff's Arrest

On March 25, 2009, a criminal complaint was filed against the plaintiff by "BRUNOS STORE #8" with the Clerk/Magistrate of the District Court of Jefferson County, Alabama. The

criminal complaint stated, in pertinent part:

| | |
|---|---|
| Check Date: | 11/19/2008 |
| Check Amount: | $40.77 |
| Victim Fee: | $30.00 |
| Victim: | Brunos Store #8 |
| Complainant: | Ms Reva Harris / Phone (205) 426-1733 |
| | 1001 Westlake Blvd., Bessemer, AL 35020 |

The criminal complaint was signed by Reva Harris.

Nowhere in the complaint is any reference made to CPRS or CCS.  Attached to the complaint was a copy of the $40.77 check. The plaintiff does not know who Reva Harris is or where Reva Harris works or has worked in the past.  The plaintiff acknowledges that the criminal complaint states that the victim in the case is Bruno's store number 8.

On November 18, 2009, the plaintiff was driving in Birmingham when she drove up on a police road block. When the police officer came to the plaintiff's window, she gave him her Alabama identification card — her driver's license was suspended and/or revoked — and her social security number. When the officer returned to the plaintiff's car, he informed her that there was an outstanding warrant for her arrest and took her to the county jail in downtown Birmingham. Her picture was taken and she was fingerprinted.  She was then placed in a holding cell for "maybe thirty or forty-five minutes or so" and released without having to post a secured bond.  Shortly thereafter, the plaintiff was required to go to court to answer the charges filed by Bruno's. After she explained her situation to the prosecutor, all charges were dropped.

Plaintiff's Claims For Credit Damage and Lost Credit Opportunity

The plaintiff has never seen any consumer report that contains negative information related to the $40.77 check.  Pursuant to the request of Bruno's, CPRS did not report information regarding

9

the $40.77 check to any credit bureaus. Pursuant to Bruno's request, CPRS reported information on the plaintiff's $40.77 check to CCS, to be included in CCS's negative file.  The information reported by CPRS on CCS's negative file indicated only that a $40.77 check was passed at Bruno's using the plaintiff's account and that the $40.77 check had been returned due to insufficient funds. No statement was made as to the validity of the check or whether it was forged, only that it was not backed by sufficient funds in the plaintiff's checking account. The plaintiff has been able to consistently cash her checks at the Winn-Dixie grocery store.

CCS admits that it is a consumer reporting agency. CPRS provides web-based consumer reports to third parties; it denies that it is a consumer reporting agency.

ANALYSIS

The plaintiff seeks summary judgment as to liability only as against CCS and as to her claims, under Count One, under 15 U.S.C. §1681i(a), ©, and (d), as well as 15 U.S.C. § 1681e(b).

Claims under 15 U.S.C. § 1681i(a)© & (d)

Federal law provides:

(a) . . . if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file[.]

. . .

© . . . Whenever a statement of a dispute is filed, unless there is reasonable grounds to believe that it is frivolous or irrelevant, the consumer reporting agency shall, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and

accurate codification or summary thereof.

. . .

(d) . . . Following any deletion of information which is found to be inaccurate or whose accuracy can no longer be verified or any notation as to disputed information, the consumer reporting agency shall, at the request of the consumer, furnish notification that the item has been deleted or the statement, codification or summary pursuant to subsection (b) or © of this section to any person specifically designated by the consumer who has within two years prior thereto received a consumer report for employment purposes, or within six months prior thereto received a consumer report for any other purpose, which contained the deleted or disputed information.

15 U.S.C.A. § 1681i (a), ©, and (d).

As has been noted,

The Eleventh Circuit Court of Appeals has interpreted § 1681i(a) of the FCRA as imposing a duty on the credit reporting agency to make "reasonable efforts" to investigate and correct inaccurate or incomplete information brought to its attention by the consumer. *Cahlin v. General Motors Acceptance Corp.,* 936 F.2d 1151, 1160 (11th Cir.1991). According to the appellate court, when a consumer brings a claim for violation of this duty, a court is "called upon to determine whether the credit reporting agency could have discovered an error in a particular report through a reasonable investigation." *Id.* Thus, the Eleventh Circuit has held that a claim under § 1681i(a) is properly raised when "a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry." *Id.* (emphasis in original).

*Williams v. Colonial Bank*, 826 F. Supp. 415, 418 (M.D. Ala. 1993) *aff'd*, 29 F.3d 641 (11th Cir. 1994).

The plaintiff argues that CCS "failed to correct said inaccurate information." (Doc. 100, p. 21.) She states that "CCS should also have deleted the false information from its systems." (Doc. 100, p. 22.) However, she does not state, much less offer evidence, <u>as to what information she refers or how that information is inaccurate</u>. Similarly, the plaintiff has not shown how the defendant violated sections © and (d). Summary judgment is inappropriate for the plaintiff on these claims.

<u>Claims under 15 U.S.C. § 1681e(b)</u>

The Eleventh Circuit has held that the text of § 1681e(b) "implicitly requires that a consumer must present evidence tending to show that a [CRA] prepared a report containing 'inaccurate' information" in order to sustain a claim. Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir.1991) (emphasis added). If the consumer presents no such evidence, there is no need to "inquire further as to the reasonableness of the procedures adopted by the credit reporting agency." Id. Thus, "[t]o establish a prima facie violation of § 1681e(b), <u>a consumer must present evidence that a credit reporting agency's report was inaccurate.</u>" Jackson v. Equifax Info. Servs., 167 Fed.Appx. 144, 146 (11th Cir .2006) (unpublished per curiam opinion); Enwonwu v. Trans Union, LLC, 164 Fed.Appx. 914, 918 (11th Cir.2006) (unpublished per curiam opinion) (same). District court opinions from this circuit predating Cahlin reached the same result. See Lowry v. Credit Bureau, Inc. of Ga., 444 F.Supp. 541, 544 (N.D. Ga. 1978) (Murphy, J.) (noting that a consumer report must be inaccurate to sustain a claim under § 1681e(b)); Middlebrooks v. Retail Credit Co., 416 F.Supp. 1013, 1015 (N.D .Ga.1976) (Freeman, J.) (following unpublished 1973 decision of the undersigned which held that "in order to pursue a cause of action based on a willful or negligent violation of 15 U.S.C. § 1681e(b), the report sought to be attacked must be inaccurate"); Austin v. BankAmerica Serv. Corp., 419 F.Supp. 730, 732 (N.D. Ga.1974) (Moye, J.) (same).[16] The other circuits who have addressed the issue are in agreement.  See Cortez v. Trans Union, LLC, 617 F.3d 688, 708 (3d Cir. 2010) (to show noncompliance with § 1681e(b), a plaintiff must show that "inaccurate information was included in [his] credit report"); DeAndrade v. Trans Union LLC, 523 F.3d 61, 66 (1st Cir. 2008) ("It is thus clear that to prevail on a § 1681e(b) claim, a plaintiff must demonstrate that his or her credit report sports an actual inaccuracy." (emphasis original)); Sarver v. Experian Info. Solutions, 390 F.3d 969, 971–72 (7th Cir. 2004) (same); Dalton v. Capital Associated Indus., 257 F.3d 409, 415 (4th Cir. 2001) (same); Washington, 199 F.3d 263, 267 n. 3 ("Courts applying § 1681e(b) uniformly limit recovery to cases where the failure to follow procedures causes actual harm (i.e., release of an inaccurate report to the consumer)." (emphasis omitted)); Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 39 (D.C. Cir. 1984) (same); Lawrence v. Trans Union LLC, 296 F.Supp.2d 582, 587 (E.D. Pa.2003) (same).

*Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 698-99 (N.D. Ga. 2012) (emphasis added).

The plaintiff is not entitled to summary judgment because she cannot offer evidence to make out a prima facie case. The plaintiff has failed to identify the inaccuracy. She first argues that her name being "associated" with the two forged checks and the incorrect license number is an inaccuracy. However, she has submitted no evidence that demonstrates this as being an inaccuracy.

CCS made no representation as to the plaintiff's role in passing the checks or as to whether the checks were valid or forged, merely that the plaintiff's name was "associated" with them, which is true.

The plaintiff next argues that certain "codes" used by the defendant constitutes a "use" of "inaccurate information." (Doc. 100, pp. 33-37.) First, stating that unidentified and allegedly false information was "used" by the defendant is not equivalent to identifying an inaccuracy. Further, the plaintiff's argument on this point is difficult to understand. She cites the deposition of Kamila Kibilda, the Vice-President of CCS, at pages 64, 82, and 86-88. The entirety of the transcript on those pages is as follows:

> Q. All right. Let's go to bate stamp number 41. So first tell me what a DIFS -- what does that mean?
>
> A. Derogatory Information File System.
>
> Q. All right. Is that the Certegy Negative File? Is that the same thing?
>
> A. Yes.
>
> Q. All right. So Certegy Negative File is the trade name for the DIFS system, would you say that?
>
> A. No. Certegy Negative File is a process. It can relate to a process as well, touching the negative
>
> Q. And tell me again, what is a CD 2 Risk? What does that mean?
>
> A. It means that it's either a Code 1, which is negative, or a Code 2, which is risk management, which means that it's all those models and algorithms that I mentioned that we do to determine that a transaction is risky. So some merchants choose to negative map that way and some merchants choose not to. Wal-Mart maps it as a negative 3111.
>
> Q. Is that correct? Did they correctly --
>
> A. Yes.
>
> Q. So you don't dispute that. Who puts the 3111 in?

A.      That's the response that the negative file provides.

Q.      And who enters the R Code?

A.      It's not entered. It's automatically stamped on the transaction electronically.

Q.      By who?

A.      By the negative file.

Q.      By the computer system?

A.      Right.

Q.      CCS's computer system?

A.      That's right.

(Doc. 113-1, pp. 127-128) (page 64 of the Kibilda deposition).

Q.      . . . does that mean?

A.      I''s just one R Code that was given.

Q.      I mean the CD numbers, it gives two different CD numbers, a negative or risk model. That means it 5 can be -- the decline could be associated with either one of those models?

A.      Right. So, in this particular instance, Wal-Mart could consider the 3111 either a Code 1 or a Code 2.

Q.      All right. Code 1 would be the specific negative information that's listed?

A.      Code 1 would be negative information. It's a general term.

Q.      In general?

A.      Yes.

Q.      And Code 2 would be general risk model?

A.      That's correct.

Q.      So CCS is not -- CCS's position is not that these three checks were the sole decision, reasons for the decline of the Treasury check on September 2009?

A.      No, it is. That's what the R Code was issued, was 3111, which is a negative R Code.

Q.      But you coded it more generally and broadly?

A.      No, that's just what Wal-Mart could interpret it as. We coded it extremely specifically, which is

(Doc.113-1, pp. 163-164) (page 82 of Kibilda deposition).

A.      . . . 3111, which is negative response only.

Q.      So Wal-Mart -- what do you mean when you say Wal-Mart could consider -- what does that mean?

A.      So Wal-Mart is self-insured. They could choose to take our negative decline and accept it as such or they could choose not to and take the check anyway. It's not CCS's financial responsibility.

Q.      But you recommended to them that they could make a decision based on general negative information or general risk modeling by CCS?

A.      No. We recommended that this is a negative decline, which means there is negative information on that ID, Alabama 1421396.

Q.      Right. You keep telling me that. I understand that. You explained it. I'm not confused about that.

A.      Okay.

Q.      What I'm confused about is, what does the CD 1 or PCA-CD 2 Risk Codes, what is that information for?

A.      It's just to tell the customer service agent that it could be a Code 1 or a Code 2, according to Wal-Mart. Because the customer service agent is not going to know how Wal-Mart treats those particular transactions.

Q.      So the codes are Wal-Mart's codes?

A.      These are our codes that Wal-Mart can choose to interpret how they want. So I'll give you an example as to why that's the case. So the customer 4 service agent doesn't necessarily know what 3111 is.  And they don't necessarily know how Wal-Mart is interpreting that, whether it to be negative or it to be just high risk. So when the consumer is handed the disclosure card at Wal-Mart, they are handed a Code 1 or Code 2. Code 1 means it was negative, Code 2 means that it was high risk. So when the consumer calls in,

> it gives the agent a little bit more information that it could be this situation or it could be that situation so that they know what the consumer was handed.

Q.  And you all told Wal-Mart that it could be either situation?

A.  No. We told Wal-Mart that it's negative.  That's a false statement. We told Wal-Mart that it's  negative. But how Wal-Mart chooses to interpret that is either/or. That's a very important distinction.

Q.  You're going to have to explain because I don't understand what you're talking about. I'm sorry. I'm going to leave here understanding. Okay. So I understand that you all told them that this is a R Code 311 based on negative information and you identify the

(Doc. 113-1, pp. 127-128, 163-164, 171-175.)  The plaintiff also cites court document 75-1 as being the document to which the parties refer in the above-quoted deposition.

The court fails to understand how any of the above information assists the plaintiff's case in any way.  First, this information was not included in the plaintiff's statement of facts and should be disregarded for that reason alone. Second, the information does not appear to identify a new "inaccuracy," merely a different use of an old one.

The plaintiff may be arguing that these computer-generated codes have negative connotations and are "inaccurate in that [they] are based on all the information available to CCS including information about the forged check." (Doc. 100, p. 34.)  Thus the argument appears to be that these codes are wrong because the information upon which they are based is wrong. The problem with that argument is that the plaintiff still has not shown how the underlying information is false.

The plaintiff next appears to argue that CCS should not have approved the $241.72 check. (Doc. 100, p. 35, 36.)  The plaintiff's second amended complaint does not make a claim for the handling of this check.   (Doc. 49.)  The plaintiff may not add such claims now. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint

through argument in a brief opposing summary judgment.")[4]  Further, the court finds no support for the plaintiff's statement that the defendant "issued multiple inaccurate approvals and denials" and that it "declined checks/issued negative reports from September 2009 to January 2010, in part, based on the false forged Southern Family Markets check." (Doc. 100, p. 36-37.)  The cited evidence simply does not support this statement.

The plaintiff having failed to show that CCS reported inaccurate information about her, she has not shown that she is entitled to summary judgment on her claims under 15 U.S.C. § 1681e(b).

RECOMMENDATION

Based on the foregoing it is RECOMMENDED that the plaintiff's motion for summary judgment be denied.

Any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.  If objections are filed, the opposing party has ten (10) additional days to file a response to the objections.

---

[4]Confusingly, the plaintiff cites Kibilda's deposition testimony regarding the Midfield Animal Clinic check when discussing the Bruno's check.  (Doc. 100, p. 36) (citing Kilbida deposition at 17-19).

DONE this 22nd day of March, 2013.

Robert R. Armstrong, Jr.
United States Magistrate Judge

APPENDIX 1

The plaintiff offers the following "fact":

> CCS, Inc. approved the $40.77 fraudulent and stolen check, only attempted to match the D.L. # and defendant CPRS accepted the check for collection under its Collection Services Agreement with Bruno's.  (CCS, Inc. Declaration; Doc. 67, Sealed Exhibit 1)

(Doc. 100, p. 5.)  The evidence referenced is apparently one of several documents that the court allowed the plaintiff to file under seal.  These included:  1. Plaintiff's Exhibit 6 (Defendant CPRS' Supplemental Disclosure) 2. Plaintiff's Exhibit 7 (Defendant CCS' 9/15/09 Call Log) 3. Plaintiff's Exhibit 16 (Defendant CCS' Log of Check Approvals and Declines) 4. Plaintiff's Exhibit 17 (Defendant CPRS/High Cotton Mailer Agreement) and 5. Plaintiff's Exhibit 18 (Defendant CPRS/Bruno's Collection Services Agreement).  See Order of November 8, 2011 Granting Motion to Seal.  These documents appear as part of, and also as exhibits to, court document 75.  However, the plaintiff's reference to "Sealed Exhibit 1" is confusing.  The Collection Services Agreement is document 75-4.

The plaintiff also alleges as fact that "[s]he believed that filing the police report, anticipating an ensuing fraud investigation by the BPD that never materialized, satisfied her obligation regarding all the stolen checks."  (Doc. 100, p. 6.)  The evidence she cites for this fact does not support it.  Further, it is irrelevant to the issues before the court.  It will not be included.

The plaintiff offers the following fact:

> On or around March, 2009, defendant CPRS began the process of prosecuting the defendant for the stolen $40.77 by referring defendant's name and other information to High Cotton for prosecution so that High Cotton could prepare and mail the statutory prosecution letter to Ms. Austin pursuant to CPRS' agreement with High Cotton.  [Doc. 59-5, p.20, Re: Akins Deposition and Exhibits; Doc. 59-2, p. 73-76, Re: Austin Deposition Exhibits; Doc. 67, Plaintiff's Sealed Exhibit 17; Plaintiff's 2, Re: CPRS, Inc. Computer Log)

(Doc. 100, pp. 6-7.)  The evidence cited does not support the fact as stated.  The testimony of Akins supports the fact as written by the court.  Document 59-2 at pages 73-76 includes the complaint and warrant, a copy of the check, and bond.  Document 67 at exhibit 17 is only the agreement between High Cotton and CPRS.  (Doc. 75-4.)  Document 67 at exhibit 2 is a computer log, which does not support the fact except to show that someone noted in a computer that the check was "in prosecution" as of 3/13/09.

The plaintiff also offers that: "After Certegy satisfied the prerequisite statutory notice requirement for prosecution found at Alabama Code 13A-9-13.2."  That statement is a legal conclusion and not properly part of the facts of this case.  Further, it is not supported by the evidence cited by the plaintiff.  The court has also omitted the statement: "CPRS acted individually and as Bruno's agent for purposes of the prosecution process.  (Doc. 67, Plaintiff's Sealed Exhibit, Re: Collection Services Agreement)."  The exhibit cited does not support that CPRS was Bruno's agent.  Further, such a conclusory statement is not properly part of the facts.  Also, the plaintiff has offered the following facts which are irrelevant to this case:

13.    The thieves then wrote another check ("Bruno's Stolen Check") to Bruno's on July 29, 2009 in the amount of $241.72 and the plaintiff did not write or authorize this check that was also stolen from her.  (Doc. 59-2, p.65-66, Re: Austin Deposition and Exhibits; Austin Declaration)

14.    CCS, Inc. approved the $241.72 fraudulent and stolen check and defendant CCS purchased the check and began collection proceedings under its Collection Services Agreement with Bruno's. (Doc. 59-2, p.65-66, Re: Austin Deposition and Exhibits; Austin Declaration; Doc. 67, Plaintiff's Exhibit 15; CCS, Inc. Declaration)

15.    On or around August 2009, Ms. Austin received a letter from defendant CPRS regarding the stolen and fraudulent $241.72 check that she did not write or authorize.   (Doc. 59-2, p. 64, Re: Austin Deposition Exhibits; Austin Declaration; Doc. 67, Plaintiff's Exhibit 9)

(Doc. 100, pp. 8-9.)  The plaintiff offers the following fact:

16.   In September, 2009, the plaintiff received a notice from CCS, Inc. about an extremely large check that was stolen from her and fraudulently passed.  (Doc. 59-1, p. 15, Re: Austin Deposition and Exhibits; Austin Declaration;  Plaintiff's Sealed Exhibit 7, Re: CCS, Inc. Computer Call Log)  Sometime in September, 2009, the plaintiff called Certegy and reached a representative from CCS, Inc. and told defendant CCS, Inc. that she had received collection letters regarding the $40.77 and other checks that were stolen and not written or authorized by her. (Doc. 59-1, p. 15, Re: Austin Deposition and Exhibits; Austin Declaration;  Doc. 67, Plaintiff's Sealed Exhibit 7, Re: CCS, Inc. Computer Call Log)  The CCS, Inc. representative acknowledged that CCS, Inc. had conflicting Driver's License numbers in its system for her. However, the representative took no action and gave her no guidance or information on how to address the identity theft and driver's license discrepancies. (Doc. 59-1, p. 15, Re: Austin Deposition and Exhibits; Austin Declaration;  Doc. 67, Plaintiff's Sealed Exhibit 7, Re: CCS, Inc. Computer Call Log)

(Doc. 100, pp. 9-10.)  The evidence cited is either cited in too vague a manner (i.e. "Austin Declaration") or does not support the fact.  This fact too will not be included in the court's statement of facts.   Similarly, the plaintiff cites the following fact:

17.    The plaintiff told defendant CCS, Inc. that she did not write the stolen checks that they were collecting, that she had filed a police report and she asked defendant CCS, Inc. to stop collection efforts regarding the stolen checks and notate her fraudulent check activity on the account.  (Doc. 59-1, p. 15 & 59-2, p. 62, 77, Re: Austin Deposition and Exhibits; Austin Declaration)

(Doc. 100, pp. 10-11.)  The evidence cited only shows that the plaintiff called CPRS, not CCS, and told them that "the checks had been stolen." (Doc. 59-1, p. 15(60).)  The remainder of the fact is not supported by the evidence cited.  This fact too will not be included in the court's statement of facts.

The plaintiff offers this fact:

18.     On September 15, 2009, Defendant CCS, Inc. told her there was nothing that defendant CCS, Inc. could do about it, the CCS, Inc. representative gave Ms. Austin the driver's license numbers that were recorded on the stolen checks and Ms. Austin, simultaneously, recorded them in her journal. (Doc. 59-1, p. 77 & 59-2, p. 15, 62, Re: Austin Deposition and Exhibits; Austin Declaration)

(Doc. 100, p. 11.)  None of the citations support this fact.  The plaintiff consistently refers to document page numbers, not deposition page numbers, in its facts.  There is no page 77 to document 59-1.  Even if the court were to assume that the plaintiff meant deposition page number 77, as opposed to court document number page 77, the cited testimony still does not support the statement.  Page 15 of document 59-2, is also not helpful.  Importantly, the court accidentally found what appears to be the referenced journal page at page 77 of document 59-2.  It appears therefore that the plaintiff may have meant document 59-1, page 15, and 59-2, page 77.  When the court looks at the remainder of the plaintiff's alleged facts, it appears that this misnumbering trend continues.  Even still, after giving the plaintiff this benefit of the doubt, the citations still do not support the facts.  Page 15 of document 59-1, only discusses whet the court has already included.  While page 77 of document 59-2 does contain two drivers' license numbers, that does not establish that the numbers were given to the plaintiff by CPRS.

        Similar problems exist for the following fact offered by the plaintiff:

        19. While she could not remember the exact date of her call to Certegy during her deposition, after reviewing her journal, the CCS, Inc. computer call log and the information therein, she is certain that the September 15, 2009 letter from CCS, Inc. was in response to this call as she only made one call to Certegy regarding the stolen checks.  (Doc. 59-1, p. 77 & 59-2, p. 15, 41 [p. 161, line 12], 62), Re: Austin Deposition and Exhibits; Austin Declaration)

(Doc. 100, pp. 11-12.)  The court can only find support for the statement, "she could not remember the exact date of her call."  Omitted for the same reason is the following fact:

        20.     The September 15, 2009 letter does not memorialize Ms. Austin's entire conversation with defendant CCS, Inc. in that it leaves out reference to her identity theft report and focuses on the Midfield Animal Clinic check that she does not dispute was authorized by her.  (Doc. 59-1, p. 77 & 59-2, p. 15, 41 [p. 161, line 12], 62 Re: Austin Deposition and Exhibits; Austin Declaration)  Notably, the plaintiff has made several attempts individually and through counsel to resolve this check over the past few years to no avail.  (Plaintiff's Exhibit 10)  Even counsel for plaintiff after inquiry during deposition would not assist the plaintiff in resolving the same.

(Doc. 100, pp. 12-13.)   The following fact is also omitted for failure to cite specific pages of the evidence:

        21.     After September 15, 2009, the defendant CCS, Inc. did not investigate and/or notify Bruno's and defendant CPRS that the information reported against Ms. Austin and about the $40.77 and $241.72 checks to Bruno's in the Certegy negative file, the statutory prosecution letter, the warrant and to FMS, Inc. and any other third party agencies it had reported said information to that said information was inaccurate in

that said checks were not written or authorized by the plaintiff.  (Austin Declaration; Doc. 59-3, Re: Certegy Kibilda Declaration)

(Doc. 100, p. 13.)

The plaintiff offers this fact:

23.  From 2008 to present, defendant CPRS, Inc. reported false information directly and/or indirectly to third parties (i.e. CCS, Inc. aka Certegy, Certegy Negative File national database, Jefferson County District Attorney, Wal Mart, Winn Dixie, FMS Solutions, local check cashing agencies), namely, that Tiffany Austin passed checks to Bruno's on 11/19/08 and 7/29/09 written on a closed accounts with insufficient funds in the amount of $40.77 and $241.72, that one of her Driver's License numbers was 7478045, 7068065 and/or 7706285, that she resided at 5526 Court P at the time the check was passed, that she wrote a worthless check that met DA Eligibility guidelines for prosecution and that she had not responded satisfactorily to its inquiries. (Plaintiff's Declaration; Doc. 67, Plaintiff's Exhibits 2, 5, 6, 7, 8, 9, 10, 15; Doc. 59-5, p. 11, Re: Akins Deposition)

(Doc. 100, pp. 14-15.)  The vague reference to "Plaintiff's Declaration" and "Akins Deposition" is insufficient to support this fact.  The court should not have to figure out for itself to which portions of what documents the plaintiff refers.  Further, the documents cited do not support this fact.  For this same reason, the court has not included the following facts:

24.  From 2008 to present defendant CCS, Inc. reported false information directly and/or indirectly to third parties (i.e. Certegy Negative File, Jefferson County District Attorney, Wal Mart, Winn Dixie, FMS Solutions, local check cashing agencies), namely, that Tiffany Austin passed checks to Bruno's on 11/19/08 and 7/29/09 written on a closed accounts with insufficient funds in the amount of $40.77 and $241.72, that one of her Driver's License numbers was 7478045, 7068065 and/or 7706285, that she resided at 5526 Court P at the time the check was passed, that she wrote a worthless check that met DA Eligibility guidelines for prosecution and that she had not responded satisfactorily to its inquiries.  (Plaintiff's Declaration; Doc. 67, Plaintiff's Exhibits 2, 5, 6, 7, 8, 9, 10, 15; Doc. 59-5, p. 11, Re: Akins Deposition)

25.  The presence of the negative information related to the $40.77 and $241.72 checks in the Certegy and other national check databases, public records and to private third parties (i.e. High Cotton, Jefferson County District Attorney and FMS Solutions) have contributed to her checks being declined by CCS, Inc. at Wal-Mart (see Doc. 67, Plaintiff's Exhibit 16; Kibilda Deposition, p. 64, 82, 86-88), Winn Dixie and at several local check cashing agencies. (Austin Declaration; Kibilda Deposition, p. 64, 82, 86-88))  Additionally, the negative information related to the $40.77 and $241.72 checks in the national check database and public records prevented me [sic] from opening a checking account a Legacy Federal Credit Union. (Austin Declaration)

(Doc. 100, pp. 15-17.)

The plaintiff offers these additional facts which its citations do not support:

27.     CCS, Inc. aka Certegy admits that it is a consumer reporting agency and a furnisher of information as defined by the FCRA as it share information with third parties.  (Doc. 67, Plaintiff's Exhibit 3 & 20)  CCS, Inc. sells services based on proprietary risk models to help prevent merchants and consumers from being victims of fraudulent, stolen and other bad checks.  (Doc. 67, Plaintiff's Exhibit 13; Plaintiff's Sealed Exhibit, Collection Services Agreement)

30.     CCS, Inc. confirms that this national check verification database is the same as the Certegy Negative File. (Kibilda Depo., p. 127-128) To date, said information has remained a part of the Certegy Negative file check authorization process used by CCS, Inc. (Kibilda Depo., p.64, 71-73) and said information has not been deleted, corrected and/or flagged, nor has CCS, Inc. sent notification to CPRS or any other entity that said information is inaccurate. (Kibilda Depo., p. 106-107; 127-128)

(Docs. 100, p. 18; 102, p. 2.)